UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TERRY L. GIBBONS,                                              **DECISION**
                                                                **and**
                                        Plaintiff,              **ORDER**

          v.
                                                               **02-CV-668F**

JoANNE B. BARNHART,
 Commissioner of Social Security,                              **(consent)**

                                        Defendant.
_____

APPEARANCES:        DIANE S. HINMAN, ESQ.
                    Attorney for Plaintiff
                    375 Linwood Avenue
                    Buffalo, New York  14209

                    TERRANCE P. FLYNN
                    United States Attorney
                    Attorney for Defendant
                    JANE B. WOLFE
                    Assistant United States Attorney, of Counsel
                    Federal Centre
                    138 Delaware Avenue
                    Buffalo, New York  14202

## JURISDICTION

On October 8, 2002, the parties to this action consented, pursuant to 28 U.S.C. §

636(c)(1), to proceed before the undersigned.  The matter is presently before the court

on Defendant's motion for judgment on the pleadings (Doc. No. 7), filed May 5, 2003.


## BACKGROUND

Plaintiff Terry L. Gibbons seeks review of the Commissioner's decision denying

him Social Security Disability Insurance ("SSDI") benefits under Title II of the Social

Security Act ("the Act").  In denying Plaintiff's application for benefits, the Commissioner

determined that although Plaintiff has not, since February 28, 1998, the alleged onset

date of Plaintiff's disability, engaged in substantial gainful activity and suffers from

severe impairments including chronic bilateral knee discomfort and back discomfort,

Plaintiff does not have an impairment or combination of impairments within the Act's

definition of impairment.  (R. 25, 28-29).[1]  The Commissioner further determined that

Plaintiff's allegations regarding his limitations are not fully credible.  (R. 26, 28).

Although the Commissioner found Plaintiff was unable to perform any past relevant

work, the Commissioner determined that Plaintiff retained the residual functional

capacity for the full range of sedentary work, in light of Plaintiff's age, education and

work experience.  (R. 28, 29).  As such, Plaintiff was found not disabled, as defined in

the Act, at any time through the date of the ALJ's decision.  (R. 29).


## PROCEDURAL HISTORY

Plaintiff filed an application SSDI benefits on February 17, 2000, alleging that

since February 28, 1998, he had been disabled by neck, low back and bilateral knee

pain.[2]  (R. 49, 113-15, 123).  The application was initially denied on April 25, 2000 (R.

94-97), and, upon reconsideration, on May 30, 2000.  (R. 99-101).  On June 16, 2000,

---

[1] "R." references are to the page numbers of the administrative record submitted in this case for the court's review.

[2] Plaintiff previously applied for disability benefits on April 23, 1996, alleging an onset disability date of December 14, 1995 based on knee and back problems.  (R. 22, 83, 84).  The application was initially denied on August 28, 1996, and, upon reconsideration (no date provided).  (R. 83).  Upon Plaintiff's timely request, a hearing was held before an administrative law judge ("ALJ") on December 12, 1997 and, on February 27, 1998, the ALJ rendered a decision denying the application.  (R. 22, 83).  When Plaintiff failed to appeal the ALJ's February 27, 1998 decision, it became the Commissioner's final decision on the matter.  (R. 22).  Although the alleged disability onset date in the current application is February 28, 1998, one day after the ALJ's February 27, 1998 decision denying Plaintiff's earlier disability benefits application, no good cause was found to reopen Plaintiff's earlier application.  (R. 22).

Plaintiff filed a request for an administrative hearing before an Administrative Law Judge ("ALJ") with the SSA. (R. 102). On March 26, 2001, an administrative hearing was held before ALJ Bruce R. Mazzarella ("ALJ Mazzarella" or "the ALJ"), at which time Plaintiff, represented by Mark Laudisio, Esq. ("Mr. Laudisio" or "Laudisio"), appeared and testified. (R. 37-69). Testimony was also given by Vocational Expert Julie Andrews ("Andrews"). (R. 70-78). In a Hearing Decision dated May 23, 2001, the ALJ found Plaintiff was not disabled. (R. 19-29).

On June 6, 2001, Plaintiff requested review of the hearing decision by the Appeals Council. (R. 17-18). By letter dated September 8, 2001, the Appeals Council advised Plaintiff it would defer action on the requested review for 40 days while awaiting receipt of additional evidence or arguments Plaintiff intended to present. (R. 16). On April 19, 2002, the Appeals Council acknowledged receipt of additional information submitted by Plaintiff In connection with the requested hearing decision review (R. 15), including medical records pertaining to examinations performed by Eugene J. Gosy, M.D. ("Dr. Gosy"), on June 19, August 14 and October 16, 2001 (R. 341-48), a letter from Mr. Laudisio dated October 15, 2001 (R. 349-51), and drug information forms pertaining to Plaintiff's worker's compensation claim (R. 352-65). On April 19, 2002, the Appeals Council, upon considering Plaintiff's request for review of the ALJ's hearing decision and the record, including the newly submitted evidence, denied the request for review, (R. 13-14), thereby rendering the ALJ's hearing decision the final decision of the Commissioner.

By letter dated June 20, 2002, Mark J. Collins, Esq., advised the Appeals Council that he had been contacted by Plaintiff seeking assistance in legal counsel interested in

representing Plaintiff in a civil action challenging the Appeals Council's denial of the disability benefits application, and requesting an extension of 60 days in which to commence such action.  (R. 11-12).  On July 29, 2002, Diane S. Hinman, Esq, ("Ms. Hinman") was appointed to represent Plaintiff in a civil action.  (R. 10).  In a letter dated July 30, 2002, Ms. Hinman advised the Appeals Council that she had recently been approached by Plaintiff for representation in a civil action challenging the Appeals Council's decision denying disability benefits, and that Plaintiff did not learn until May 22, 2002, that Mr. Laudisio would not represent Plaintiff in such action.  (R. 9).  By letter dated August 9, 2002, the Appeals Council granted Plaintiff's request for an extension of time in which to commence a civil action challenging the denial of disability benefits, thereby extending the time in which to commence such action to thirty days from the receipt of such letter, which was presumed to be five day from the date of the letter.  (R. 8).  This action followed on September 12, 2002.

By order filed October 17, 2002 (Doc. No. 5), Defendant was given 120 days to file an answer.  Defendant's answer to the Complaint, filed on January 8, 2003 (Doc. No. 6), was accompanied by the attached record of the administrative proceedings.  On May 5, 2003, Defendant filed a motion for judgment on the pleadings and a Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings (Doc. No. 8) ("Defendant's Memorandum").  On July 15, 2003, Plaintiff filed Plaintiff's Memorandum of Law in Response to Defendant's Motion for Judgment on the Pleadings (Doc. No. 9) ("Plaintiff's Memorandum").  Oral argument was deemed unnecessary.

Based on the following, Defendant's motion for judgment on the pleadings is

GRANTED.  The Clerk of the Court is directed to close the file.


## **FACTS**[3]

Plaintiff Terry L. Gibbons ("Plaintiff"), was born on July 10, 1955 and was 45

years old as of the date of the hearing before the ALJ.  (R. 23, 38).  Plaintiff graduated

from high school where he attended two years of vocation training in the machine shop.

(R. 47-48, 129).  Plaintiff's past relevant work experience includes work as an assistant

printing press operator and press helper; both positions required Plaintiff to stand and

climb, frequently lift 80 lbs., and push rolls of paper weighing 1200 lbs.  (R. 42-45, 124).

An X-ray of Plaintiff's left knee taken December 18, 1989 showed a "normal left

knee."  (R. 181).  On May 14, 1990, Michael T. Grant, M.D. ("Dr. Grant") performed

arthroscopic surgery on Plaintiff's left knee for internal derangement (a mechanical

disorder of the knee involving a disruption of the normal functioning of the ligaments or

cartilages (menisci) of the knee joint), and post operative diagnosis was hypertrophic

synovitis (inflammation of the membranes lining the knee joint) with chrondal defect

(defect in the cartilage at the end of the bone) and loose chrondal body (joint cartilage)

and small fragments of the membrane excised from the left knee showed evidence of

chronic inflammation.  (R. 59, 175-78).  Following the surgery, Plaintiff returned to work.

(R. 59).

On December 14, 1995, Plaintiff sustained a work-related injury to both his

---

[3] Taken from the pleadings, administrative record and motion papers filed in this action.

knees,[4] (R. 304), for which Plaintiff was again treated by Dr. Grant.[5]  (R. 168-78, 215-38, 304).  On May 13, 1996, Dr. Grant performed arthroscopic surgery on Plaintiff's right knee.  (R. 59,168-78).  Post operative diagnosis was hypertrophic synovitis, thickened plica (fold in the knee joint lining), and Grade II chondromalacia (softening of the joint cartilage in the kneecap) in all three right knee compartments.  (R. 168).

Following the arthroscopic surgery of Plaintiff's right knee, Plaintiff attended 12 physical therapy sessions between October 2, 1996 and November 1, 1996, at Buffalo Rehab Group.  (R. 189-90).  On November 1, 1996, physical therapist Jeffrey J. Woodrich discharged Plaintiff to a home exercise program.  (R. 189).

An X-ray and computerized tomography ("CT") scan of Plaintiff's lumbar spine were taken on January 15, 1997.  (R. 239).  Both tests showed minimal L5 spondylosis (spinal osteoarthritis), and the CT scan also revealed no evidence of herniated nucleus pulposus.  (R. 239).

Plaintiff was evaluated on August 5, 1997, by Dr. Grant who reported that Plaintiff continued to complain of pain and discomfort in both knees and his back, although Michael C. Geraci, Jr., M.D. ("Dr. Geraci") of Buffalo Spine & Sports Medicine, P.C. ("Buffalo Spine & Sports"), who had been treating Plaintiff in connection with Plaintiff's back complaints, had discharged Plaintiff from Dr. Geraci's care.  (R. 232, 275). Upon examination by Dr. Geraci, Plaintiff demonstrated an antalgic gait (limp adopted to avoid

---

[4] The specific injury Plaintiff sustained on December 14, 1995 is described only as a "sprain."  (R. 84).

[5] Although the exact date Plaintiff resumed treatment with Dr. Grant is not in the record, a Patient Procedure History indicates Plaintiff was treated by Dr. Grant between 1990 and 1993 for his earlier knee condition, and then resumed treatment with Dr. Grant on January 2, 1996.  (R. 233-34).

putting weight on joint or limb to minimize or avoid pain), had a boggy synovitis about

the left knee, no effusion about the right knee, crepitus to motion about both knees, and

Plaintiff's neurovascular status was intact.  (R. 232).  Dr. Grant prescribed bilateral

neoprene sleeves (provide knee support) for Plaintiff's knees and an air brace to

support his lower back, and opined that Plaintiff "will have permanent residual disability

in regards [*sic*] to this work-related injury."  (R. 232).

Dr. Grant next evaluated Plaintiff's knee condition on September 30, 1997, when

examination showed good range of motion in the knees with crepitus, limited back

flexibility and neurovascular status grossly intact.  (R. 230).  Dr. Grant instructed Plaintiff

to take either Naprosyn or Ibuprofen for pain, to return for further evaluation in five

weeks, and to contact Dr. Geraci for further evaluation as to his low back condition.  (R.

230-31).  Dr. Grant also reported, "[w]e will try to get the patient back to the work

environment at that time."  (R. 231).

On February 6, 1997, Dr. Grant evaluated Plaintiff's knee condition, reporting

Plaintiff continued to complain of persistent aching and discomfort and "giving way

about his knees."  (R. 228).  Upon examination, there was no effusion or gross

instability about Plaintiff's knees and his range of motion was good with crepitus.  (R.

228).

Between December 2, 1997 and February 13, 1998, Plaintiff attended 27

physical therapy sessions at Buffalo Rehab Group.  (R. 186-88, 191-92).  According to

physical therapist Daniel J. Schwenk ("PT Schwenk"), over the course of the treatment,

which included aerobic exercise progression, flexibility and spinal/scapular stabilizing

strengthening, isometric LE strengthening, and a home exercise program, Plaintiff

reported a 50% improvement to his low and mid-back pain, although he had not returned to his functioning level prior to injuring his back 1 ½ years earlier.  (R. 186). Because Plaintiff had no significant improvement since February 2, 1998, and given his ability to independently perform a home exercise program, Plaintiff was discharged on February 13, 1998.  (R. 186).

When Dr. Grant examined Plaintiff on January 7, 1998, Plaintiff complained of aching, discomfort and stiffness in his knees.  (R. 226).  Examination revealed no effusion and good range of motion with crepitus.  (R. 226).

Upon examination by Dr. Grant on March 4, 1998, Plaintiff "ambulate[d] comfortably," his knees were without effusion and showed good range of motion with some crepitus.  (R. 225).  Plaintiff was encourage to continue with his home exercise program.  (R. 225).

Plaintiff was examined on May 12, 1998 by Dr. Grant who found no effusion, good range of motion of Plaintiff's knees, nontender to palpation and motion, and some crepitus.  (R. 224).  Dr. Grant stated Plaintiff "will be allowed to return to work effective 5-26-98," and a prescription for new patellar stabilizing braces was given.  (R. 224).

In a letter dated May 26, 1998 from one Mike Valentine ("Valentine") at ColorGraphics, to Mrs. Reed at Stride,[6] Valentine writes: "Let this letter serve notice that Terry Gibbons has requested to return to work, however we have no jobs available to offer him at this time."  (R. 121).

When Dr. Grant examined Plaintiff on June 9, 1998, Plaintiff had quadriceps

---

[6] The record does not further identify "Mrs. Reed," nor does the record define what type of business or organization "Stride" is.

atrophy about his knees without effusion and with good range of motion with some crepitus.  (R. 223).  Dr. Grant opined that Plaintiff's condition was "stabilized" and estimated Plaintiff's scheduled loss of use of each leg at 10% bilaterally.  (R. 223).

Upon examination by Dr. Grant on July 14, 1998, Plaintiff displayed good range of motion about his knees with some crepitus and some quadriceps atrophy.  (R. 222). Bilateral patellar stabilizing braces were prescribed and Plaintiff's "permanent residual disability" was noted.  (R. 222).

A cervical spine X-ray taken on August 10, 1998, showed "mild narrowing at the C5-C6 disc space," but was "essentially negative."  (R. 165).

Dr. Grant examined Plaintiff on September 29, 1998, and again noted Plaintiff "ambulates with a bit of an antalgic gait," and has limited mobility as to his knees with some crepitus.  (R. 220).  Dr. Grant's impression was that Plaintiff "is totally disabled from his previous occupation at Colorgraphics," and repeated his opinion that Plaintiff had a "permanent residual disability."  (R. 220).

On October 12, 1998, Dr. Grant completed a form,[7] dated October 12, 1998, in which Dr. Grant stated Plaintiff's condition caused "[p]ersistent pain, discomfort, aching and giving way about his knees," that Plaintiff ambulates "with a bit of an antalgic gait," has "limited mobility about the knees with some crepitus," and diagnosed "persistent pain and discomfort about both knees."  (R. 219).  As to the extent of Plaintiff's disability, Dr. Grant opined Plaintiff was, as that time, totally disabled with regard to any occupation as an assistant printing press operator , would never be able to return to his

---

[7] There no title or heading on the form, nor is there any indication on the form as to which agency prepared the form, or whether the form was generated by Dr. Grant's office.

regular occupation, and was not a suitable candidate for a rehabilitation program.  (R. 219).  Nevertheless, in response to the question asking when Plaintiff "will be able to resume any work," Dr. Grant checked the box indicating "never" as to Plaintiff's previous occupation, but checked the box indicating "indefinite" as to any occupation.  (R. 219).

In an Office of Vocational and Educational Services for Individuals with Disabilities ("VESID") Medical Report Form completed on October 14, 1998, Dr. Grant reported Plaintiff was being treated for pain and discomfort about both knees, prognosis was "guarded," and that because of persistent pain and discomfort about both knees, Plaintiff "is considered totally disabled from his previous occupation at Colorgraphics," although Plaintiff could use public transportation and wore bilateral patellar stabilizing braces.  (R. 268-69).  Dr. Grant further reported Plaintiff could work "as tolerated," and released Plaintiff to work "except to his previous occupation."  (R. 269).  On a separate VESID Medical Report for Orthopedic and Miscellaneous Disabilities dated October 16, 1998, Dr. Grant reported Plaintiff's has back and neck impairments and arthritis in both knees, complains of persistent pain, discomfort, aching and giving way about his knees, ambulated with an antalgic gait, has limited mobility about his knees with some crepitus, neurovascular status is intact, and that pain and discomfort prevent Plaintiff from returning to his previous occupation.  (R. 266-67).  Plaintiff's condition was not expected to improve, but Plaintiff "may work light duty as tolerated."  (R. 267).

Jeff R. Pavell, D.O. ("Dr. Pavell"), a colleague of Dr. Geraci at Buffalo Spine and Sports, evaluated Plaintiff on November 9, 1998.  (R. 275).  At that time, Plaintiff reported improved upper extremity and thoracic movement with decreased pain, but continued low back pain with some radiation to the bilateral buttocks.  (R. 275).  Plaintiff

was using a lumbosacral corset for back support and patellofemoral stabilization braces to improve his gait.  (R. 275).  Physical examination showed Plaintiff ambulated with a normal heel/toe gait, without use of an assistive device, a 25% decrease lumbar range of motion in the forward flexion position, but full in the extension position and bilateral sidebending.  Bilateral straight leg raising and slump testing were negative.  (R. 275).  Some tightness of the hamstrings and iliopsoas muscles bilaterally, with some inhibition of the gluteus medius was noted.  (R. 275).  Dr. Pavell's impression was lumbopelvic muscle imbalances in the lumbosacral area, although Plaintiff "does not have a disability at this time and should be able to return to his previous activities."  (R. 275).  Dr. Pavell encouraged Plaintiff to continue with his home exercise program which "is sufficient to allow [Plaintiff] to return to a functional lifestyle."  (R. 275).  According to Dr. Pavell, Plaintiff anticipated continuing with his VESID application and would begin training in the near future, and Plaintiff believed "his work with VESID will be helpful in helping [Plaintiff] obtain a job that entails much less lifting," an activity with which Plaintiff reported having much trouble.  (R. 275).

Between November 13, 1998 and June 15, 2001, Plaintiff visited Chaitanya K. Trivedi, M.D. ("Dr. Trivedi"), his primary care physician, for referrals and pain medication in connection with consistent complaints of neck, low back and knee pain.  (R. 197, 302-16).  On November 13, 1998, Plaintiff complained of spasms and numbness in his low back, back flexion was to 45 degrees, extension was to 5 degrees with pain, and Plaintiff had pain with rotation and lateral bending.  (R. 315).  Dr. Trivedi prescribed Ibuprofen and Soma.  (R. 315).

A CT scan of Plaintiff's lumbosacral spine taken on November 16, 1998 showed

disc bulge at L3-L4 without stenosis, but was otherwise unremarkable.  (R. 163).

Upon examination by Dr. Trivedi on February 15, 1999, Plaintiff had spasms in his lower back, pain with all range of motions, and pain in his knees.  (R. 311).  Ibuprofen and Soma were prescribed.  (R. 311).

When Plaintiff was examined by Dr. Trivedi on November 8, 1999, Plaintiff complained of pain in his upper and lower back.  (R. 312).  Examination revealed spasms and painful range of motion in the neck and lower back, for which Ibuprofen and Soma (muscle relaxer used to treat pain and stiffness resulting from muscle spasms) were prescribed.  (R. 312).

On February 22, 2000, Plaintiff underwent a consultation performed by orthopedic surgeon George Fuska, M.D. ("Dr. Fuska"), in connection with Plaintiff's complaint of an injury to his low back and subsequent injury to both knees.  (R. 248-51).  According to Dr. Fuska, Plaintiff stated he initially injured his back on April 7, 1988 upon picking up a heavy shaft, and sought treatment for low back pain from Dr. Trivedi who prescribed pain medication and muscle relaxants and referred Plaintiff for physical therapy.  (R. 248).  Dr. Fuska also noted Plaintiff's 1991 left knee injury and 1995 right knee injury.  (R. 248-49).  Upon examination, Dr. Fuska observed that Plaintiff "is using awkward positions which are not really compatible with his complaints."  (R. 249).  Plaintiff's lumbosacral spine was straight with maintained lumbar lordosis, the lumbosacral joint was slightly positive for pain, but the sciatic notches were not painful and Dr. Fuska was unable to palpate any muscular spasms.  (R. 249).  According to Dr. Fuska, Plaintiff could bend forward 50 degrees without any shift, 20 degrees to the side and 15 degrees backward with complaints of discomfort, had reasonably good bilateral

patellar and ankle jerks, straight leg raising was "basically within normal limits," sensitivity to touch on either leg was denied, strength and motor innervation in both legs was within normal limits, pelvic twist was painful from both sides and bending of the cervical spine was painful in the lumbosacral area. (R. 250). Both of Plaintiff's knees were then without fluid and without any noise or crepitus except for tibial twist of the left knee which created some noise in the medial compartment. (R. 250). There was, however, some pain in the medial joint line of the right knee upon palpation, but there was no pain in the left knee medial joint line, nor in either knee's lateral joint line. (R. 250). A half-inch difference between the circumference of Plaintiff's right and left knees was noted. (R. 250).

Based on his impression of lumbosacral pain and internal derangement of both knees, Dr. Fuska opined that Plaintiff is "mildly disabled." (R. 250). Dr. Fuska considered Plaintiff "a poor historian, but based on the history I have and review of the medical reports it is my opinion that [Plaintiff] has a mild disability related to both of his knees," but did not believe Plaintiff's April 7, 1988 back injury to be a contributing factor to such disability. (R. 250). Rather, Plaintiff's back complaints were attributed to degenerative changes which Dr. Fuska did not feel "creat[ed] any disability which would prevent him from working." (R. 250). Dr. Fuska further commented that

> I have a big problem with this gentleman because he has such sparse objective
> findings which would contribute to his problem or would be consistent with his
> present subjective complaints that I believe he probably can return to work with
> minimal restrictions on excessive ambulation or lifting more than 40 pounds.

(R. 250).

On an SSA Disability Report - Adult form completed on February 29, 2000,

Plaintiff states that he was denied vocational rehabilitation by VESID because Plaintiff was unable to return to full-time work.[8]  (R. 122-31).

In response to a request sent to Dr. Grant from J. McCarthy ("McCarthy"), a Disability Analyst with New York State Office of Temporary and Disability Assistance, Division of Disability Determination, dated March 10, 2000, and seeking information for use in evaluating Plaintiff's disability benefits application, Dr. Grant completed several forms regarding Plaintiff's treatment.  (R. 216-19).  In particular, Dr. Grant submitted a copy of the October 14, 1998 VESID Medical Report Form, in which Dr. Grant opined that Plaintiff would never return to his previous employment with ColorGraphics, but "may work light duty as tolerated."  (R. 218).  Dr. Grant also submitted a copy of the untitled October 12, 1998 form in which Dr. Grant indicated that Plaintiff's knee condition prevented Plaintiff from ever returning to his previous occupation at ColorGraphics, but that it was "indefinite" as to when Plaintiff would be able to return to "any occupation."  (R. 219).

In a Physical Residual Functional Capacity Assessment performed by Verna Yu, M.D. ("Dr. Yu), on April 21, 2000, Dr. Yu reported Plaintiff's primary diagnosis was a herniated disc in his lumbosacral spine, and bilateral knee disorder following arthroscopic repair.   (R. 276-83).  Dr. Yu assessed Plaintiff's exertional limitations as limited to occasionally lifting and carrying 20 pounds, frequently lifting and carrying 10 pounds, standing, walking or sitting six hours in an eight hour day, unlimited pushing

_____

[8] Plaintiff's ambiguous statement that VESID denied his application for vocational rehabilitation because Plaintiff "can't get back to work for full time" (R. 129), implies that Plaintiff would only be able to work part time.

and pulling, and no postural, manipulative, visual, communicative or environmental limitations.  (R. 277-80).  Dr. Yu's assessment was reviewed and affirmed by Janis L. Dale, M.D. on May 30, 2000.  (R. 283).

Plaintiff was further examined by Dr. Trivedi on June 23, 2000 when he continued to complain of low back pain and spasms, and range of motion was painful in his neck, low back and knees.  (R. 316).  As before, Ibuprofen and Soma were prescribed.  (R. 316).

When Dr. Grant examined Plaintiff on July 12, 2000, Plaintiff continued to complain of persistent pain and discomfort in his knees, and that his knees were "giving way."  (R. 304).  Dr. Grant reported Plaintiff ambulates with an antalgic gait, has quadriceps atrophy bilaterally, limited mobility with crepitus, Plaintiff's neurovascular status was intact, that Plaintiff is persistently symptomatic and prescribed bilateral patellar stabilizing braces and a cane, and that Plaintiff's work-related injury had resulted in some "permanent residual disability."  (R. 304).

Upon examination by Dr. Trivedi on September 22, 2000, Plaintiff complained of pain in his neck, low back and both knees, for which Ibuprofen and Soma were prescribed.  (R. 313).

On November 7, 2000, Dr. Grant evaluated Plaintiff who continued to complain of persistent pain and discomfort about his knees.  (R. 306).  Dr. Grant noted Plaintiff had been fitted with bilateral patellar stabilizing braces which Plaintiff was encouraged to use to keep his legs strong, and that Plaintiff would be followed as needed.  (R. 306).  Dr. Grant opined that "this case is closed and [Plaintiff] should be allowed to be evaluated by me a couple of times a year for renewal of his patellar stabilizing braces."  (R. 306).

On November 28, 2000, Plaintiff returned to Dr. Geraci at Buffalo Spine & Sports for the first time since May 12, 1998,[9] seeking "an updated prescription for his low back [pain], despite . . . having obtained a new one through his primary care physician less than six months ago."  (R. 287).  Plaintiff complained of low back pain accompanied by a burning sensation in both legs and knee pain for which Plaintiff work patella stabilizing braces, numbness and tingling in his heels and arches bilaterally, and weakness and giving out of the knees.   (R. 287).  According to Dr. Geraci, Plaintiff had not attended physical therapy in more than two years, but had been compliant with a home exercise program.  (R. 287).  Dr. Geraci reported that since he last examined Plaintiff in 1998, Plaintiff has sustained an injury to his neck when a tree branch fell on him.  (R. 287). Dr. Geraci noted that Plaintiff had been off work since his accident on December 14, 1995, and had applied for VESID retraining, but was unable to complete the course because of his pain.  (R. 287).

Upon examination by Dr. Geraci, Plaintiff's lumbar spine showed full forward flexion, a 25% loss in extension, and 50% loss in left and right sidebending.  (R. 287). Lower extremity motor strength and reflexes were equal and intact bilaterally, straight leg raising and femoral nerve stretch testing were negative bilaterally, slump test (to record qualitative changes in sitting in an objective manner) was positive bilaterally at 90 degrees, Gillet's test (standing hip flexion test) revealed no sacroiliac dysfunction,

---

[9] Although Dr. Geraci had not examined Plaintiff since May 12, 1998, the record indicates that Dr. Pavell, a D.O. with Buffalo Spine & Sports, examined Plaintiff on November 9, 1998.  (R. 275).  *See* Discussion, *supra*, at 10-11.

leg lengths were equal in both prone and supine positions, prone extension range of motion was decreased 25% without pain, spring testing (for joint instability) revealed increased pain over the L4 vertebral body, tightness was noted over the quadratus lumborum (muscle of the posterior abdominal wall), hamstrings, rectus femoris (one of the quadriceps muscles running from the hip to the knee and used to strengthen or lift the knee), and anterior hip capsule (fibrous capsule enclosing hip joint and greater part of the neck of the femur), with inhibition of the gluteus medius (hip), maximus (buttocks) and abdominals.  (R. 287).  Dr. Geraci's impression was L5-S1 degenerative disc disease and lumbopelvic muscle imbalances.  (R. 287).  Dr. Geraci did not feel Plaintiff was a candidate for epidural injections, but suggested Plaintiff work with a pain management specialist and, when the pain was controlled, that perhaps Plaintiff's function would increase to permit him to finish his VESID retraining.  (R. 287).  Dr. Geraci did not give Plaintiff a new prescription for a back brace as Dr. Geraci had changed his treatment philosophy and no longer recommended such braces based on "some new information on increased blood pressure, pulse rates, and musculature stabilization."  (R. 287).

On January 6, 2001, Plaintiff underwent a pain management consultation performed by Eugene J. Gosy, M.D. ("Dr. Gosy"), in connection with Plaintiff's Worker's Compensation claim relative to pain along Plaintiff's spinal axis as well as his lower extremities. (R. 302-03).  According to Dr. Gosy, Plaintiff initially sustained a low back injury at work in 1988 and sustained two additional low back and knee injuries over the next seven years.  (R. 302).  In 1998, 2 ½ years after his employment accident, Plaintiff was involved in a tree cutting accident resulting in a cervical spine injury.  (R. 302).

17

Plaintiff reported experiencing continuous aching in his knees with distal numbness and tingling associated with foot cramping, no swelling or erythema (redness of the skin caused by increased blood flow to the capillaries), and a constant pulling sensation in the lumbar region referring to the buttocks and traveling to the cervical region.  (R. 302). Plaintiff described his cervical area pain as an aching, burning, pulling sensation relative to his shoulders.  (R. 302).  Plaintiff's current medications including Ibuprofen and Soma.  (R. 303).

Upon physical examination, Dr. Gosy observed mottling of the skin in the cervical area attributed to use of a heating pad, diminished lumbar lordosis, no active paraspinal muscle spasm, noticeably atrophied left thigh and calf musculature, and bilateral knee crepitus without swelling or erythema.  (R. 303).  Plaintiff displayed 50% reduction in lumbar retroflexion, with bilateral knee extension limited to 160 degrees.  (R. 303). Strength in all extremities was 5/5 and reflexes were absent throughout.  (R. 303).

Dr. Gosy's impression was "[m]echanical low back pain associated with bilateral knee arthropathy, second to work related injuries.  There is a distal sympathetically maintained pain component without any evidence of sympathetic over activity at present."  (R. 303).  Dr. Gosy rated Plaintiff's disability status as "marked partial from the worker's comp. related items."  (R. 303).  Dr. Gosy further reported Plaintiff "has a mild partial disability from the cervical area injuries, creating a 100% disability from the combination of ailments."  (R. 303).  Dr. Gosy recommended treating Plaintiff with a combination of Vioxx, Neurontin and Soma.  (R. 303).

At Plaintiff's administrative hearing held on March 26, 2001, Plaintiff appeared and testified that pain in his neck, back and knees prevented him from working.  (R. 49).

18

Plaintiff attributed his back and knee pain to work injuries, and claimed that he injured his neck in 1998 when he was struck by the limb of a tree being cut down by Plaintiff's neighbor.  (R. 45-46, 52).

With regard to Plaintiff's vocational training, the ALJ inquired as to whether Plaintiff had ever been referred to or evaluated for vocational rehabilitation with New York to assess whether Plaintiff could be retrained for other work.  (R. 48).  Plaintiff explained that he had applied with VESID, but was unsure of the status of his application and last heard that VESID considered Plaintiff uninterested, but he had not further contacted VESID and was unsure whether his VESID case was closed or remained open.  (R. 48).  Plaintiff further testified that he was not interested in attending school or college because he is unable to sit or stand long enough to concentrate.  (R. 48-49).

Plaintiff testified that he wore a neck brace and used heating pads for neck pain, wore a back brace and took Ibuprofen and Soma for back pain, and wore bilateral knee braces and used a cane to walk.  (R. 50-51, 56, 59-60).  In response to the ALJ's inquiries, Plaintiff testified that although a walking cane had been prescribed, Plaintiff found the walking canes available at the hospital supply store, which had curved handles with big "hubs" on the end, unattractive, so Plaintiff used a straight cane with a single "hub" on the end.  (R. 60-61).  When asked which of his alleged disabling conditions was most severe, Plaintiff testified his back was his primary disabling condition, followed by his knees and then his neck.  (R. 58-59).

Despite his alleged impairments, Plaintiff testified that his daily activities included watching his children, doing dishes, cooking dinner, some laundry and "minimum"

housecleaning.  (R. 62).  Plaintiff was able to care for his personal needs, watched "a lot" of television, took his own medications, and used to enjoy fishing and hunting, but was no longer able to pursue those interests.  (R. 62-63).  Plaintiff testified that he could drive using a back pillow and neck wrap for support.  (R. 41).

In response to the ALJ's inquiries, Plaintiff estimated that he could stand still for only a few minutes before having to stretch his feet because of spasms, could alternate sitting and standing for "a couple of hours" before having to lie down, could walk two or three blocks with the assistance of knee braces and a cane, and lift between five and ten pounds.  (R. 64-67).  According to Plaintiff, it took him an hour to walk the "two or three blocks" from the parking lot to the building where the administrative hearing was held as Plaintiff walked at a slow pace and needed to stop twice to rest and "get my feet and stuff back to organization until I don't hurt."  (R. 65-66).  Plaintiff further testified that the muscle relaxants he sometimes took made him tired, requiring Plaintiff to nap for an hour or two.  (R. 65).

Julie Andrews ("Andrews") appeared and testified as a vocational expert at the Administrative Hearing.  (R. 69-78).  Andrews first testified that Plaintiff's past relevant work as an offset assistant press operator was, according to the Dictionary of Occupational Titles, listed as requiring medium exertion, although as described by Plaintiff, the position required heavy exertion.  (R. 72).  In response to a hypothetical posed by the ALJ of an individual of the same age and with the same education as Plaintiff, who could sit for 30 minutes, alternate sitting and standing for two hours, slowly walk several blocks with several breaks, lift up to ten pounds, Andrews testified such individual could not perform Plaintiff's past relevant work, nor any other work in the

national economy.  (R. 73-74).  When the ALJ modified the hypothetical to provide that the individual could sit for two hours at a time and up to eight hours a day, stand and walk two hours, occasionally lift ten pounds, but for whom chronic knee, back and neck pain prevented stooping, crouching, kneeling, crawling and climbing stairs, Andrews testified the individual would be capable of the full range of sedentary work which did not require postural activities.  (R. 74-75).  The ALJ then further modified the hypothetical to provide the individual could not sit for two hours at one time, but could alternate sitting and standing throughout an eight hour day, lift ten pounds, and had postural limitations.  (R. 75).  Andrews testified that such individual could not perform Plaintiff's past work, nor the full range of sedentary work, but identified several positions that could be performed by such an individual, including surveillance system monitor for which there are 191,000 positions nationally and 1,250 regionally, order clerk for which there are 1.7 million positions nationally and 465 regionally, and jewelry preparer for cast setting for which there are 96,000 positions nationally, and 205 regionally.  (R. 76-77).  Andrews, in response to further questioning by the ALJ, reiterated that Plaintiff could not perform any of the three identified positions if he was unable to alternate between sitting and standing for more than a couple of hours without having to lie down.  (R. 78).

On May 23, 2001, the ALJ issued his decision denying Plaintiff disability benefits.  (R. 21-29).  In denying Plaintiff's application, the ALJ gave little weight to Dr. Gosy's opinion of disability because such opinion was based on only one examination that was performed on a consultative basis in connection with Plaintiff's Workmen's Compensation claim, for which a finding of disability generally pertains only to an

individual's ability to perform past relevant work.  (R. 25).  The ALJ also discounted the Plaintiff's subjective complaints of pain and total disability as inconsistent with the record as a whole.  (R. 26).

Plaintiff submitted additional information to the Appeals Council, including a reports from Dr. Trivedi dated June 15, 2001 and September 14, 2001, and reports from Dr. Gosy dated June 19, 2001, August 14, 2001 and October 16, 2001.  In particular, on June 15, 2001, Dr. Trivedi examined Plaintiff who complained of neck, low back and bilateral knee pain.  (R. 345).  Dr. Trivedi found Plaintiff had range of motion pain in his knees, neck and back, and neck and back spasms, and prescribed Ibuprofen, Soma and Celebrex.  (R. 345).

On June 19, 2001, Dr. Gosy reassessed Plaintiff who complained his pain worsened over the preceding several weeks, feeling depressed and difficulty concentrating but denied suicidal ideation.  (R. 343).  Dr. Gosy noted Plaintiff "began weeping several times during the exam."  (R. 343).  It was Dr. Gosy's impression that Plaintiff's disability status is "marked partial from workers comp. related items and 100% when combined with his cervical injuries."  (R. 343).  Wellbutrin (antidepressant), Neurontin (pain medication) and Vioxx (arthritis medication) were prescribed, Ibuprofen and Celebrex were discontinued, and Soma was maintained.  (R. 343).

Dr. Gosy reassessed Plaintiff on August 14, 2001, at which time Plaintiff reported that just as he noticed his depression was improving with Wellbutrin, the medication ran out.  (R. 342).  Plaintiff also reported that Neurontin and Vioxx were not particularly helpful, he continued to have mood swings and stress which Plaintiff attributed to increased financial pressures, but denied any suicidal ideation.  (R. 342).  Upon

examination, Dr. Gosy found Plaintiff to be pleasant and not in any acute distress, but in "some discomfort" and "became extremely tearful throughout the history and examination." (R. 342). Plaintiff's deep tendon reflexes were "normoactive" in the lower extremities, both knees were braced, strength was "pain inhibited" in the lower extremities, and Plaintiff walked with a forward stooped posture with an antalgic gait. (R. 342). Dr. Gosy's impression was that Plaintiff continued to be "marked partially disabled from a workers compensation injury and it is 100% when combined with cervical injury." (R. 342). Dr. Gosy restarted Wellbutrin and prescribed Lortab for pain, Baclofen to reduce spasms and Soma for sleep. (R. 342).

Dr. Trivedi next examined Plaintiff on September 14, 2001, when Plaintiff again complained of neck, low back and bilateral knee pain and, upon examination, Dr. Trivedi's findings were pain with range of motion in the knees, neck and back. (R. 346). (R. 346). Dr. Trivedi noted Plaintiff's medications, as prescribed by Dr. Gosy, included Baclofen for spasm, Lortab for pain, Soma for sleep, and Welbutrin for reactive depression. (R. 346).

On October 16, 2001, Dr. Gosy reassessed Plaintiff who was not in acute distress, but walked with a "severely antalgic gait," was "cane dependent," had bilateral knee braces, and a fitted air belt. (R. 347). Dr. Gosy's impression was that Plaintiff's mechanical back and neck pain, and degenerative knee joint disease rendered Plaintiff "totally and permanently disabled." (R. 347).

In connection with the instant action, Plaintiff submitted as evidence, attached as Exhibit F to the Complaint, a Psychological Assessment ("Psychological Assessment"), dated August 23, 2002, prepared by psychologist Ronald L. Michelini, Ph.D. ("Dr.

Michelini").  In assessing Plaintiff's level of intellectual functioning, Dr. Michelini

administered several tests, the results of which include a verbal IQ of 91, performance

IQ of 89, and full scale IQ of 89, placing Plaintiff in the upper range of low average

intelligence.  Psychological Assessment at 1.  According to Dr. Michelini, an

examination of Plaintiff's scaled scores for verbal comprehension and perceptual

organization "suggests considerable variation in [Plaintiff's] intellectual abilities," with

relative strengths in social judgment and fluid reasoning, and relative weaknesses in

general knowledge and learning new tasks.  Psychological Assessment at 1-2.  Dr.

Michelini surmised that Plaintiff's general academic skills are commensurate with his

intellectual ability, commenting that Plaintiff's scaled score for Information and Digit

Symbol suggested a possible learning disability.  *Id*. at 2.  Dr. Michelini concluded that

Plaintiff's "intellectual performance overall suggests significant limitation on the type of

work he can do, especially employment that relies primarily on mental skills."  *Id*.


## DISCUSSION

**1.     Disability Determination Under the Social Security Act**

An individual is entitled to disability insurance benefits under the Social Security

Act if the individual is unable

> to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of
> not less than 12 months....  An individual shall be determined to be under a
> disability only if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of substantial
> gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A) & (2)(A), and 1382c(a)(3)(A) & (C)(I).  Once the claimant proves that he is severely impaired and is unable to perform any past relevant work, the burden shifts to the Commissioner to prove that there is alternative employment in the national economy suitable to the claimant. *Parker v. Harris,* 626 F.2d 225, 231 (2nd Cir. 1980).

## A.    Standard and Scope of Judicial Review

The standard of review for courts reviewing administrative findings regarding disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative law judge's findings are supported by substantial evidence.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence requires enough evidence that a reasonable person would "accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229 (1938).

When the Commissioner is evaluating a claim, he must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and . . . educational background, age and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).  If the opinion of the treating physician is supported by medically acceptable techniques and results from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight.  *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d).

The Commissioner's final determination will be affirmed, absent legal error, if it is

supported by substantial evidence.  *Dumas v. Schweiker, supra*, at 1550; 42 U.S.C. §§ 405(g) and 1383(c)(3).  "Congress has instructed . . . that the factual findings of the Secretary,[10] if supported by substantial evidence, shall be conclusive."  *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The federal regulations set forth a five-step analysis that the Commissioner must follow in determining eligibility for disability insurance benefits.  20 C.F.R. §§ 404.1520 and 416.920.  *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v. Schweiker*, 675 F.2d 464 (2d Cir. 1982).  The first step is to determine whether the applicant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  If the individual is engaged in such activity the inquiry ceases and the individual cannot be eligible for disability benefits.  *Id.*  The next step is to determine whether the applicant has a severe impairment which significantly limits his physical or mental ability to do basic work activities, as defined in the regulations.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  Absent an impairment, the applicant is not eligible for disability benefits.  *Id.*  Third, if there is an impairment and the impairment, or an equivalent, is listed in Appendix 1 of the regulations and meets the duration requirement, the individual is deemed disabled, regardless of the applicant's age, education or work experience, 20 C.F.R. §§ 404.1520(d) and 416.920(d), as, in such a case, there is a presumption that an applicant with such an impairment is unable to

---

[10] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security, effective March 31, 1995.  In accordance with § 106(d) of that Act, the Commissioner of Social Security has been substituted for the Secretary of Health and Human Services as the defendant in this action.

perform substantial gainful activity.[11]  42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A);

20 C.F.R. §§ 404.1520 and 416.920.  *See also Cosme v. Bowen*, 1986 WL 12118, at *2

(S.D.N.Y. 1986); *Clemente v. Bowen*, 646 F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in

Appendix 1, the Commissioner must then consider the applicant's "residual functional

capacity" and the demands of any past work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If

the applicant can still perform work he has done in the past, the applicant will be denied

disability benefits.  *Id.*  Finally, if the applicant is unable to perform any past work, the

Commissioner will consider the individual's "residual functional capacity," age, education

and past work experience in order to determine whether the applicant can perform any

alternative employment.  20 C.F.R. §§ 404.1520(f), 416.920(f).  *See also Berry v.

Schweiker, supra*, at 467 (where impairment(s) are not among those listed, claimant

must show that he is without "the residual functional capacity to perform [his] past

work").  If the Commissioner finds that the applicant cannot perform any other work, the

applicant is considered disabled and eligible for disability benefits.  *Id.*  The applicant

bears the burden of proof as to the first four steps, while the Commissioner bears the

burden of proof on the final step relating to other employment.  *Berry, supra*, at 467.  In

reviewing the administrative finding, the court must follow this five-step analysis to

determine if there was substantial evidence on which the Commissioner based her

decision.  *Richardson v. Perales*, 402 U.S. 389, 410 (1971).

---

[11] The applicant must meet the duration requirement which mandates that the impairment must last for at least a twelve month period.  20 C.F.R. §§  404.1509 and 416.909.

**B.**     **Substantial Gainful Activity**

The first inquiry is to determine whether the applicant is engaged in substantial gainful activity.  "Substantial gainful activity" is defined as "work that involves doing significant and productive physical or mental duties and is done for pay or profit."  20 C.F.R. §§  404.1510 and 416.910.

In this case, the ALJ concluded that Plaintiff has not engaged in substantial gainful activity since February 28, 1998, the alleged onset date of Plaintiff's disability. (R. 22, 28).  This finding is not disputed.

**C.**     **Severe Physical or Mental Impairment**

The next step of the analysis is to determine whether Plaintiff had a severe physical or mental impairment significantly limiting his ability to do "basic work activities."  "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b), 416.921(b).  "Basic work activities" include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out, remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b).  Further, a physical or mental impairment is severe if it "significantly limit[s]" the applicant's physical and mental ability to do such basic work activities.  20 C.F.R. §§ 404.1521(a), 416.921(a) (bracketed text added).

The ALJ concluded that Plaintiff has several impairments preventing him or limiting his ability to do basic work activities and are thus, severe as defined under the

28

applicable regulation, 20 C.F.R. § 404.1521.  (R. 23).  Plaintiff's severe conditions

include chronic bilateral knee discomfort and back discomfort.  (R. 25).  The ALJ did not

consider Plaintiff's neck impairment to be severe based on a dearth of objective

evidence substantiating Plaintiff's assertion of neck pain.  (R. 25).  The ALJ then

continued on to the next step, a finding of whether Plaintiff's impairments were severe

enough to be set forth in the Listing of Impairments, Appendix 1, 20 C.F.R. Pt. 404,

Subpt. P, Regulation No. 4.


**D.**   **Listing of Impairments, Appendix 1**

The third step is to determine whether a claimant's impairment or impairments

are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P.  If the

impairments are listed in the Appendix, they are considered severe enough to prevent

an individual from performing any gainful activity.  20 C.F.R. §§ 404.1525(a),

416.920(a)(4)(iii) and 416.920(d).  In the instant case, while the ALJ determined that

although Plaintiff has chronic bilateral knee and back discomfort that interfered with his

ability to work and thus was, within the meaning of the Regulations, severe, Plaintiff's

condition was not so severe as to meet the criteria of any of the impairments set forth in

the Listing of Impairments.  (R. 25).  Substantial evidence in the record supports this

finding.[12]

The relevant listing impairments in Plaintiff case are 20 C.F.R. Pt. 404, Subpt. P,

App. 1, §§ 1.02 ("§ 1.02") (major dysfunction of a joint(s) due to any cause), and 1.04

---

[12] Because the ALJ found that Plaintiff's neck condition was not severe, the ALJ did not further consider the effects of such medical condition on Plaintiff's ability to work.

("§ 1.04") (disorders of the spine).  With regard to Plaintiff's bilateral knee impairment, §

1.02 provides that a person may be disabled based on major dysfunction of a joint

> [c]haracterized by gross anatomical deformity (*e.g.*, subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
>     A.  Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.02A.

In the instant case, although the medical evidence establishes that Plaintiff has

chronic knee pain with decreased range of motion attributed to internal derangement of

both knees, a mechanical disorder of the knee involving a disruption of the normal

functioning of the ligaments or cartilages of the knee joint, for which Plaintiff underwent

arthroscopic surgery in 1990 (left knee) and 1996 (right knee), the record fails to

establish that Plaintiff's knee impairment meets the disability criteria under § 1.03.  In

particular, although Plaintiff has been prescribed and wears knee stabilizing braces,

nothing in the record establishes that Plaintiff knee deformity is characterized by any

gross anatomical deformity such as subluxation, contracture, bony or fibrous ankylosis

or instability as required by § 1.02.  Further, although Plaintiff has chronic knee pain

with reduced range of motion, the record contains no evidence of "findings on

appropriate medically acceptable imaging of joint space narrowing, bony deconstruction

or ankylosis," § 1.02A, of either knee.  In fact, the only radiographic evidence pertaining

to Plaintiff's knees is the December 18, 1989 X-ray of Plaintiff's left knee which shows a

"normal left knee."  (R. 181).  Moreover, the record is devoid of any information

establishing that Plaintiff's knee impairment renders him unable to effectively ambulate

as required.  § 1.02A.

Specifically, the relevant regulation defines an "inability to ambulate effectively"

as

> an extreme limitation on the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A 1.00B2b(1).

Further,

> [t]o ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches, or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A 1.00B2b(2) (underlining added).

Here, although Plaintiff wears knee stabilizing braces, such braces do not qualify

as "*hand-held* assistive devices."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A 1.00B2b(1)

(italics added).  Further, although on July 12, 2000, Dr. Grant prescribed Plaintiff a cane

to assist in walking, (R. 304), nothing in the record indicates Plaintiff was prescribed or

used *two* canes.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A 1.00B2b(2).  It is significant

that because Plaintiff did not find the prescribed curved-handle "quad" or four-point cane

aesthetically pleasing, Plaintiff chose instead a straight-handled cane with a single point,

(R. 60-61), thereby begging the question as to how much stabilizing support Plaintiff needed to walk.  Additionally, although Plaintiff testified that it took him an hour to walk three blocks from the parking lot to the building in which the administrative hearing was held and that he needed to stop and rest twice (R. 65-66), and despite repeated finding that Plaintiff walks with an "antalgic gait" (*see*, *e.g.*, R. 220 (Dr. Grant on September 29, 1998), R. 342 (Dr. Gosy on August 14, 2001)), nowhere in the record is there any reference or comment made by a physician or physical therapist, or any other medical or even non-medical source corroborating the extent to which Plaintiff alleges his walking ability is impaired.  Rather, upon examining Plaintiff on February 22, 2000, Dr. Fuska, an orthopedic surgeon, commented that the degenerative changes in Plaintiff's knees did not create any disability that would prevent Plaintiff from working, and that Plaintiff could return to work "*with minimal restrictions on excessive ambulation* or lifting more than 40 pounds."  (R. 250) (italics added).  Finally, on October 14, 1998, Dr. Grant reported that Plaintiff could use public transportation.  (R. 268).

As such, the record establishes that Plaintiff's knee condition does not meet the criteria of the listed impairment of major dysfunction of a joint under § 1.02.  Turning to Plaintiff's alleged spine ailment as a basis for a disability determination, the evidence also fails to establish Plaintiff's back impairment meets the disability criteria under the relevant listing impairment, § 1.04.

According to § 1.04 of the Listing of Impairments, a person may be disabled based on disorders of the spine if the medical evidence demonstrates herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture, resulting in compromise of a nerve root or the spinal

cord, and accompanied by one of the following:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
> or
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 ("§ 1.04").

Here, the medical evidence does not establish that Plaintiff's chronic low back pain or neck pain meets the criteria of a disorder of the spine as defined under § 1.04.

In particular, as to Plaintiff's low back, the medical evidence establishes that Plaintiff has been diagnosed with lumbopelvic muscle imbalances in the lumbosacral area (R. 275, 287), L5-S1 degenerative disc disease (R. 287), and "mechanical back pain" (R. 303), and has some history of muscle spasms (R. 311, 312, 315, 316, 342, 345).  Further, the medical evidence fails to establish that Plaintiff's back disorder satisfies any of the remaining criteria set forth under § 1.04 of the Listing of Impairments.

Specifically, upon examination by orthopedic surgeon Dr. Fuska on February 22, 2000, Dr. Fuska was unable to palpate any muscular spasms (R. 249), and on January 6, 2001, Dr. Gosy examined Plaintiff and found "no active paraspinal muscle spasm." (R. 303).  Although Plaintiff's spine disorder is accompanied by some limitation of

motion and muscle weakness, there is no evidence of sensory or reflex loss or positive

straight-leg raising test as required under § 1.04.A.  To the contrary, the medical

evidence shows that Plaintiff's neurological signs, muscle strength, deep tendon

reflexes and sensation were grossly normal at every medical examination.  (R. 220,

224, 230, 232, 249, 275, 287, 303).

Nor is there any indication in the record that Plaintiff suffers from spinal

arachnoiditis, "confirmed by an operative note or pathology report of tissue biopsy, or by

appropriate medically acceptable imaging," or otherwise, as required by the criteria of §

1.04.B. of the Listing of Impairments.  Finally, a CT scan of Plaintiff's lumbosacral spine

taken on November 16, 1998 showed disc bulge at L3-L4 without stenosis, but was

otherwise unremarkable.  (R. 163).  Indeed, the record is devoid of any evidence that

Plaintiff experienced any spinal stenosis in his lumbar spine resulting in

pseudoclaudication[13] as required under § 1.04.C.

As to Plaintiff's alleged neck disorder, the medical evidence establishes only that

Plaintiff has been treated for pain and muscle spasms in his neck (R. 312, 313, 316,

345, 346), the cause of which does not appear in the record, and for which the only

objective clinical evidence is a cervical spine X-ray taken on August 10, 1998, which

showed "mild narrowing at the C5-C6 disc space," but was "essentially negative."  (R.

165).  In fact, in completing the VESID Medical Report dated October 16, 1998, Dr.

Grant attributes Plaintiff's complaints of a "back/neck impairment" as "reported" by

---

[13] The term "pseudoclaudication" refers to "pain and discomfort in the buttocks, legs and feet due
to narrowing of the spinal canal (spinal stenosis)."  Ask a Nervous System Specialist: Pseudoclaudication,
*available at* http://www.mayoclinic.com/health/pseudoclaudication/HQ01278.

Plaintiff.  (R. 266).  In examining Plaintiff on February 22, 2000, Dr. Fuska's only

mention of Plaintiff's alleged neck disorder is that "bending of the cervical spine is

painful in the lumbosacral area."  (R. 250).  Significantly, Dr. Fuska makes no reference

to Plaintiff's neck in his impression following the examination.  (R. 250).  In fact, the only

diagnosis in the record of any neck impairment is Dr. Gosy's single statement on

October 16, 2001, of "mechanical neck pain."  (R. 347).  As such, Plaintiff's neck

impairment is not so severe as to meet or equal the relevant listing impairment.

Accordingly, the record supports the ALJ's determination that none of Plaintiff's

physical impairments meet the criteria established under any of  the Listing of

Impairments.  (R. 25).  The ALJ next considered whether Plaintiff, despite suffering from

knee, back and neck disorder which neither met nor equaled any listed impairment,

nevertheless retains the residual functional capacity to perform the requirements of his

past relevant work.  (R. 25-26).


**E.    "Residual Functional Capacity" to Perform Past Work**

The fourth inquiry in this five-step analysis is whether the applicant has the

"residual functional capacity" to perform past relevant work.  "Residual functional

capacity" is defined as the capability to perform work comparable to the applicant's past

substantial gainful activity.  *Cosme, supra*, at *3.

The ALJ found that Plaintiff was unable to perform his past relevant work

experience as an offset assistant press operator and press helper because of physical

limitations.  (R. 28).  This finding is undisputed.

**F.**     **Suitable Alternative Employment in the National Economy**

As the ALJ concluded that Plaintiff was unable to perform his past relevant work, the ALJ went on to make a determination as to whether there was any position within the national economy for which Plaintiff would be qualified or suitable.  Because of the ALJ's finding that Plaintiff's impairments prevented him from returning to his previous work, the burden shifted to the Commissioner to prove that there was substantial gainful work that Plaintiff could perform in light of his physical capabilities, age, education, experience, and training.  *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).  Further, it is the clear rule in the Second Circuit that "all complaints . . . must be considered together in determining . . . work capacity."  *DeLeon v. Secretary of Health and Human Services*, 734 F.2d 930, 937 (2d Cir. 1984).  It is improper to determine a claimant's work capacity based solely upon an evaluation of the severity of the claimant's individual complaints.  *Gold v. Secretary of Health and Human Services*, 463 F.2d 38, 42 (2d Cir. 1972).

To make such a determination, the Commissioner must first show that the applicant's impairment or impairments are such that they permit certain basic work activities essential for other employment opportunities.  *Decker v. Harris*, 647 F.2d 291, 294 (2d Cir. 1981).  Specifically, the Commissioner must demonstrate by substantial evidence the applicant's "residual functional capacity" with regard to the applicant's strength and "exertional capabilities."  *Decker, supra*, at 294.  An individual's exertional capability refers to the performance of "sedentary," "light," "medium," "heavy," and "very

heavy" work.[14]  *Id.*  In addition, the Commissioner must prove that the claimant's skills

are transferrable to the new employment, if the claimant was employed in a "semi-

skilled" or "skilled" job.[15]  *Decker, supra*, at 294.  This element is particularly important in

determining the second prong of the test, whether suitable employment exists in the

national economy.  *Id.* at 296.

In this case, the ALJ determined that although Plaintiff could not return to his past

work as an offset assistant press operator and press helper, Plaintiff retained the

physical residual functional capacity for the full range of sedentary work.  (R. 28-29).

The ALJ also considered the Plaintiff's age, education and unskilled work experience in

determining that Plaintiff was not disabled as defined by the Social Security Act.  (R. 27-

28).

Plaintiff, however, asserts that both the ALJ and the Appeals Council failed to

---

[14]  "Sedentary work" is defined as: "lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools....Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §404.1567(a).

[15]  The regulations define three categories of work experience: "unskilled", "semi-skilled", and "skilled".  *Decker, supra*, at 295.
    "Un-skilled" is defined as: "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength....primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in thirty days, and little specific vocational preparation and judgment are needed.  A person does not gain work skills by doing unskilled jobs."
20 C.F.R. §404.1568(a).
    "Semi-skilled work" is defined as: "work which needs some skilled but does not require doing the more complex work duties.  Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work.  A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks."
20 C.F.R. §404.1568(b).

afford the requisite weight to Dr. Gosy's opinions that Plaintiff is completely disabled by his combination of back, neck and knee impairments.  Plaintiff's Memorandum at 1. There is no merit to this argument.

Dr. Gosy first examined Plaintiff on January 6, 2001, in a "Workers Compensation Consultation" performed in connection with Plaintiff's Worker's Compensation claim.  (R. 302-03).  The purpose of the consultation was pain management.  (R. 302).  Although Dr. Gosy impression was that Plaintiff's "disability status is marked partial from the worker's comp. related items," and that Plaintiff also "has a mild partial disability from the cervical area injuries, creating a 100% disability from the combination of ailments," (R. 303), such statement was directed to the Worker's Compensation Board and, as such, is limited to Plaintiff's previous job as an offset assistant press operator.   *See Havas v. Bowen*, 804 F.2d 783, 786 n. 1 (2d Cir. 1986) (noting in the context of a Social Security disability benefits applicant who had been found disabled for purposes of a Workers' Compensation award that the Second Circuit has "previously held, '[w]hile the determination of another governmental agency that a social security disability benefits claimant is disabled is not binding on the Secretary, it is entitled to some weight and should be considered.'") (quoting *Cutler v. Weinberger*, 516, 1282, 1286 (2d Cir. 1975)); *see also Gray v. Chater*, 903 F.Supp. 293, 299 n. 7 (N.D.N.Y. 1995) (a disability finding for purposes of workers' compensation is not dispositive as to the issue of disability for purposes of Social Security disability benefits as a workers' compensation determination measures only the ability to perform prior employment).  As such, the ALJ was not required to accept Dr. Gosy's January 6, 2001 opinion that Plaintiff is completely disabled for purposes of awarding disability

benefits under the Act.  Nor does the record demonstrate that the ALJ, as Plaintiff asserts, failed to give Dr. Gosy's opinion any weight but, rather, gave Dr. Gosy's opinion "little weight."  (R. 25).  Importantly, the ALJ observed that Dr. Gosy's January 6, 2001 opinion was based on one examination with "little in the way of clinical evidence."  (R. 25).  The ALJ also took notice of the fact that Dr. Gosy rendered the opinion in regard to Plaintiff's Workers' Compensation claim such that the opinion was properly interpreted as "essentially mean[ing] that the claimant cannot return to his past relevant work."  (R. 25).

Plaintiff further contends that although Dr. Gosy's January 6, 2001 opinion was rendered in the context of his Workers' Compensation claim, in Dr. Gosy's three later reports which Plaintiff submitted to the Appeals Council, Dr. Gosy reiterated the opinion that Plaintiff is totally disabled, citing additional objective findings supporting Plaintiff's claims of pain and limitations.  Plaintiff's Memorandum at 1.  In particular, Plaintiff points to Dr. Gosy's report that Plaintiff's strength in his lower extremities was "pain inhibited" and Plaintiff exhibited a "severely analgic gait."  *Id*. at 1-2 (citing R. 342 (August 14, 2001), and  344 (October 16, 2001)).

However, Dr. Gosy's three later reports, in addition to Dr. Trivedi's two latest reports, were made after the ALJ issued his hearing decision and, thus, were not before the ALJ but, rather, were submitted to the Appeals Council.  The Appeals Council considered such evidence, but concluded such evidence provided no basis for changing the ALJ's decision.  (R. 13-14).

Although Dr. Gosy's reports of June 19, August 14 and October 16, 2001, as well as Dr. Trivedi's reports of June 15 and September 14, 2001 (R. 341-46) were not before

the ALJ when he issued his decision on May 23, 2001, the reports were made part of the record upon their submission to the Appeals Council for consideration in connection with Plaintiff's request for review of the ALJ's decision.  *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996) (citing 20 C.F.R. § 409.970(b) which expressly authorizes claimants to submit new evidence to the Appeals Council).  The purpose of 20 C.F.R. § 409.970(b) is to provide claimants a final opportunity to submit additional evidence before the Commissioner's decision.  *Perez*, *supra*, at 45.  Further, Plaintiff's failure to explain why this evidence was not submitted to the ALJ is irrelevant as a claimant is not required to demonstrate "good cause" for failing to submit the evidence earlier.  *Id.*  Rather, the only limitations stated in § 409.970(b) are that the information must be new and material and relate to the period on or before the ALJ's decision.  *Id.*

Information is "new" if it is not merely cumulative of what is already in the record and is "material" if it is both relevant to the claimant's condition during the time period for which benefits have been denied and probative, *i.e.*, provides a reasonable probability that the new evidence would have influenced the Commissioner to decide the claimant's application differently.  *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1990) (internal citations and quotations omitted).  Where medical evidence arising subsequent to the ALJ's decision is submitted to the Appeals Council, such evidence becomes part of the administrative record to be considered by the court.  *See Brown v. Apfel*, *supra*, at 62; *Perez*, *supra*, at 45.

Here, the medical reports in question qualify as new information insofar as they were not before the ALJ nor are they merely cumulative of the evidence that was before the ALJ given that the information pertains to Dr. Gosy's examinations of Plaintiff after

the ALJ rendered his decision.  The reports, however, are not material insofar as they show that Plaintiff remained neurologically intact, nor, significantly, do they relate to the period on or before the ALJ's decision.  Furthermore, insofar as Dr. Gosy's initial examination of Plaintiff on January 6, 2001, was in the context of a pain management consultation in connection with Plaintiff's Workers' Compensation claim, (R. 302-03), but Dr. Gosy later became a treating physician, prescribing analgesics including Neurontin, Vioxx, Lortab, Soma and Baclofen, as well as antidepressants, (R. 303, 342, 343, and 344), does not make Dr. Gosy's three later findings relevant to the period prior to the ALJ's decision.  As such, the Appeals Council determination that such evidence provided no basis for altering the ALJ's decision is proper.

Nor did the ALJ fail to give proper consideration to the opinions of Plaintiff's treating physicians.  Generally, the Commissioner grants the opinion of a treating physician controlling weight only if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence  in the record, such as the opinions of other medical experts.[16]  20 C.F.R. § 404.1527(d); *Halloran v. Barnhart*, 362 F.3d 28, 31-31 (2d Cir. 2004) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993)).  The SSA regulations specify the following factors as relevant "in determining the weight to give the [treating physician's] opinion": (1) the frequency of examination and the length, nature, and extent of the treatment relationship, (2) the evidence in

---

[16]  Deference is given to the opinions of treating physicians based on the idea that opinions formed as the result of an ongoing physician-patient relationship are more reliable than opinions based solely on examination for the purposes of disability proceedings.  *See Schisler v. Sullivan, supra*, at 568.

support of the opinion, for example, the more evidence presented to support a medical opinion, particularly laboratory findings and other medical signs, the more weight the opinion is entitled to, (3) the opinion's consistency with the record as a whole, (4) whether a specialist formed the opinion, as specialists are entitled to more weight, and (5) other factors which are unspecified, but may contribute to the amount of weight to which a medical opinion is entitled.  20 C.F.R. § 404.1527(d); *Schisler, supra,* at 567.

Further, where the record contains conflicting opinions between the doctors, the treating physician's opinion is to be given deference, unless it is not supported by or is contradicted by the record.  20 C.F.R. § 404.1527(d); *Halloran v. Barnhart*, 362 F.3d 28, 31-31 (2d Cir. 2004) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir.2002); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993)).  If there are conflicting medical opinions, a specialist's opinion may be given controlling weight. 20 C.F.R. § 404.1527(d); *Halloran v. Barnhart*, 362 F.3d 28, 31-31 (2d Cir. 2004) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir.2002); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993)).

Here, as discussed, Discussion, *supra*, at 38-39, although Dr. Gosy later assumed a treating physician role with regard to Plaintiff's pain management, Dr. Gosy's sole evaluation of Plaintiff prior to the administrative hearing decision was in the context of a consultation made on January 6, 2001, in connection with Plaintiff's Workers' Compensation claim.  (R. 302-03).  Moreover, Dr. Gosy's initial opinion was not that Plaintiff was totally disabled from any work but, rather, that Plaintiff was partially disabled from his previous employment based on his work-related injuries, and totally disabled from his previous employment based on his aggregate injuries.  (R. 303). Importantly, Dr. Gosy did not find Plaintiff completely disabled as to all work at that time.

(R. 303).  As such, even if controlling weight were given to Dr. Gosy's initial evaluation, such evidence does not demonstrate Plaintiff was disabled, as required by the Act, as of the alleged onset date of February 28, 1998 through the date of the ALJ's decision.

Nor does the October 12, 1998 report prepared by Dr. Grant, who regularly treated Plaintiff's knee condition, in which Dr. Grant checked boxes indicating that Plaintiff was, at that time, totally disabled from "any occupation," would never be able to return to his "regular occupation," that it was "indefinite" as to when Plaintiff could return to "any occupation," and that Plaintiff is not "a suitable candidate for a rehabilitation program," (R. 219), require a finding that Plaintiff is totally disabled.  Rather, such opinions are inconsistent with Dr. Grant's other, later, opinions rendered October 14, 1998 and October 16, 1998.  (R. 266-69).  Specifically, on October 14, 1998, Dr. Grant reported Plaintiff was "released to work except to his previous occupation," (R. 269), whereas on October 16, 1998, Dr. Grant reported Plaintiff could not return to his previous occupation at ColorGraphics, but "may work light duty as tolerated."  (R. 267).  In fact, two years later, on November 7, 2000, Dr. Grant opined that "this case is closed and [Plaintiff] should be allowed to be evaluated by me a couple of times a year for renewal of his patellar stabilizing braces."  (R. 306).  Such conclusion does not denote a medical opinion of Plaintiff's condition consistent with a total disability.

Similarly, on November 9, 1998, Dr. Pavell who, along with Dr. Geraci, treated Plaintiff's back at Buffalo Spine & Sports, examined Plaintiff and opined that Plaintiff "does not have a disability at this time."  (R. 275).  Dr. Pavell further opined that Plaintiff "should be able to return to his previous activities."  (R. 275).

The opinions of Plaintiff's treating physicians Dr. Grant and Dr. Pavell are,

moreover, consistent with the opinion of Dr. Fuska, an orthopedic surgeon who evaluated Plaintiff on February 22, 2000 in connection with Plaintiff's low back and knee injuries.  (R. 248-51).  Dr. Fuska's examination revealed few abnormalities, leading Dr. Fuska to diagnose lumbosacral pain and internal derangement of both knees.  (R. 250).  It was Dr. Fuska's opinion that Plaintiff is "mildly disabled," and "can probably return to work with minimal restrictions on excessive ambulation or lifting more than 40 pounds."  (R. 250).  The record, as a whole, thus establishes the ALJ did not fail to give controlling weight to any treating physician's opinion regarding the extent of Plaintiff's disability.

Plaintiff also argues that the ALJ improperly discredited his testimony regarding subjective complaints including pain, and improperly discredited Plaintiff's favorable work record.  Plaintiff's Memorandum at 2-10.  While a plaintiff's subjective complaints are not alone sufficient to support a finding of disability, such complaints must be accorded weight when they are accompanied by "evidence of an underlying medical condition" and an "objectively determined medical condition [which is] of a severity which can reasonably be expected to give rise to the alleged pain."  *Cameron v. Bowen*, 683 F.Supp. 73, 77 n.4 (S.D.N.Y. 1984).  The ALJ is not, however, required to "accept without question the credibility of such subjective evidence."  *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  Rather, "[t]he ALJ has discretion to evaluate the credibility of the claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant."  *Marcus*, *supra*, at 27.

Here, the ALJ observed that Plaintiff testified to extensive pain and discomfort and limited mobility, but discredited such claims of total disability as inconsistent with

the record as a whole. (R. 26).  Despite Plaintiff's argument that by discrediting such

allegations, the ALJ failed to consider objective evidence supporting such claims,

Plaintiff's Memorandum at 2-4, the record support the ALJ's decision.

Significantly, Plaintiff himself sought to return to work at ColorGraphics in May

1998, after filing the instant application for disability benefits, but that ColorGraphics had

not jobs available to offer Plaintiff at that time.  (*See* R. 121 ("Let this letter serve notice

that Terry Gibbons has requested to return to work, however we have no jobs available

to offer him at this time.")).  Nevertheless, that Plaintiff approached ColorGraphics about

returning to work after filing the instant disability benefits application undermines

Plaintiff's own subjective belief as to his ability to work notwithstanding his self-

described chronic pain.  It is significant that in discrediting Plaintiff's credibility, the ALJ

relied on this letter, the authenticity of which Plaintiff does not dispute and the contents

of which Plaintiff does not deny.

Nor did the ALJ rely on "inference and erroneous suppositions to negate the

positive inference of [Plaintiff's] good work history," as Plaintiff suggests.  Plaintiff's

Memorandum at 4-10.  In particular, Plaintiff points to his 11 year work history at

ColorGraphics, a local printing company, and challenges the ALJ's statement that

although Plaintiff's good work record "would ordinarily raise a favorable inference of an

individual well motivated to work within his capabilities even where there are other

sources of income available," other factors within the record "outweigh that inference."

(R. 26).

The Second Circuit has observed that "ALJs are specifically instructed that

credibility determinations should take account of 'prior work history,'" and that "a good

work history may be deemed probative of credibility." *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998) (citing 20 C.F.R. § 416.929(c)(3); and Social Security Ruling 96-7p, 61 Fed. Reg. 34, 483, at 34, 486 (1996)). *See Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) ("A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."). Nevertheless, in the instant case, substantial evidence in the record supports the ALJ's determination that Plaintiff's good work history was not, by itself, probative of Plaintiff's credibility regarding the extent of his asserted pain. (R. 26).

Specifically, in May 1998, Plaintiff contacted ColorGraphics about returning to work, although at that time ColorGraphics did not have any positions available that Plaintiff could perform. (R. 121). The conversation between Plaintiff and Dr. Pavell at an examination on November 9, 1998, further undermines Plaintiff's subjective complaints. (R. 275).

Specifically, in that conversation, Dr. Pavell reported Plaintiff continued to complain of low back pain, yet Plaintiff ambulated "with a normal heel/toe gait, without the use of an assistive device." (R. 275). Dr. Pavell also noted Plaintiff had some tightness of the hamstrings and iliopsoas muscles bilaterally, with some inhibition of the gluteus medius. (R. 275). Nevertheless, Dr. Pavell opined that Plaintiff "does not have a disability at this time and should be able to return to his previous activities." (R. 275). Moreover, upon discussing Plaintiff's "problems extensively and possible job retraining," Dr. Pavell reported that Plaintiff felt that working "with VESID will be helpful in helping him to obtain a job that entails much less lifting, an activity [Plaintiff] reports having trouble with." (R. 275). Dr. Pavell also mentioned that Plaintiff was to "continue with his

VESID application and should begin training in the near future." (R. 275). Dr. Pavell concluded that he would not scheduled any follow-up visit with Plaintiff unless Plaintiff felt it was necessary. (R. 275).

There is also no indication that Plaintiff ever completed his VESID application but, rather, after filing an initial application for VESID, Plaintiff did not complete the application, much less attend any retraining, nor did Plaintiff follow up with the application. (R. 48-49, 268-69). Further, on a Medical Report Form dated October 14, 1998, completed by Dr. Grant in connection with Plaintiff's VESID application, Dr. Grant released Plaintiff for work "as tolerated" and "except to his previous occupation." (R. 268-69). This release for work is consistent with Dr. Grant's assertion on another VESID form, dated October 16, 1998, that Plaintiff could not return to his previous position at ColorGraphics, but "may work light duty as tolerated." (R. 267). Significantly, when questioned about his VESID application, Plaintiff responded that VESID "said I just wasn't interested," and that Plaintiff did not know whether his application remained open or was closed, but that he had not further contacted VESID. (R. 48-49). The record thus supports the ALJ's decision not to afford Plaintiff's good work history the positive inference supporting Plaintiff's credibility to which it would otherwise be entitled.

Nor should the matter be remanded, as Plaintiff argues, Plaintiff's Memorandum at 11-13, for consideration of new and material evidence, particularly the psychological report of Dr. Michelini who administered several IQ tests to Plaintiff and who, based on the results, opined that "intellectual performance overall suggests significant limitation on the type of work [Plaintiff] can do, especially employment that relies primarily on

47

mental skills."  Psychological Assessment at 1-2.  Rather, although Plaintiff's subtest

scores suggested to Dr. Michelini a possible learning disability, Plaintiff's IQ scores were

not so low as to render Plaintiff disabled under the Listing of Impairments.  *See* 20

C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 ("mental retardation").  Moreover, Plaintiff fails

to explain how his mental ability, even if he has a learning disability, impacts Plaintiff's

ability to perform the basic work functions enumerated under the regulations, including

his capacity for sight, hearing, speaking, understanding, remembering and carrying out

simple instructions, use of judgment, responding appropriately to supervision, co-

workers and usual work situation, and dealing with changes in a routine work setting.

20 C.F.R. § 404.1521.  In fact, Plaintiff's Psychological Assessment showed relative

strengths in social judgment and fluid reasoning.  Psychological Assessment at 1-2.  As

such, there is no basis for remanding the matter to the ALJ for consideration of Dr.

Michelini's Psychological Assessment.  The ALJ's finding that Plaintiff's has the residual

functional capacity for sedentary work is thus well supported by substantial evidence.

Upon determining that Plaintiff retained the residual functional capacity to meet

the demands of sedentary work, the ALJ then, in accordance with the second prong of

the analysis, applied the Medical Vocational Guidelines ("the grids"), to determine

whether particular jobs existed in the national economy practical for an individual limited

to the applicant's abilities and transferrable skills, *Decker, supra*, at 296, and concluded

Plaintiff was not disabled.  (R. 27-28).  Specifically, the grids are often used to

determine whether alternative employment exists in the national economy.  *Decker,*

*supra*, at 296; *Bapp v. Bowen, supra*, at 604.  The grids combine several factors

including education, work experience, and age to determine whether a finding of

Case 1:02-cv-00668-LGF   Document 11   Filed 06/22/06   Page 49 of 50

"disabled" or "not disabled" should be rendered.

In this case, the grids show that a person such as Plaintiff who, as of March 16, 2001, the date of the administrative hearing, was 45 years of age, is a younger individual between the ages of 45 and 49, would not be found disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.21. The ALJ, however, did not solely rely on the grids in determining that Plaintiff was not disabled because additional exertional and non-exertional limitations rendered Plaintiff unable to perform the full range of sedentary work. (R. 27). Rather, the ALJ consulted Julie Andrews, a vocational expert, for assistance in determining whether jobs exist in the national economy for an individual of Plaintiff's age, education, past relevant work experience and residual functional capacity. (R. 27-28). The ALJ's refusal to rely solely on the grids in determining whether Plaintiff was disabled was correct.

In particular, the Second Circuit has directed that where a disability benefits claimant cannot perform the full range of sedentary work, a strict, mechanical application of the grids is improper; rather, the plaintiff must be evaluated on an individual basis, and that such evaluation on an individual basis "can be met *only* by calling a vocational expert to testify as to the plaintiff's ability to perform some particular job." *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989) (italics added) (reversing district court's decision upholding denial of plaintiff's claim for disability benefits and remanding for further evaluation of plaintiff on an individual basis, including testimony by a vocational expert, given that the grids do not apply to claimants who are unable to perform the full range of sedentary work). Furthermore, following the vocational expert's testimony, the plaintiff must be afforded an opportunity to rebut the expert's

49

evidence. *Id*.

Here, Ms. Andrews, after reviewing Plaintiff's credentials and limitations concluded that there were substantial gainful employment opportunities which an individual the same age and with the same education of Plaintiff, who was capable of, at most, sedentary exertion with no significant overhead lifting bilaterally, and who was required to avoid dangerous heights and moving machinery, could perform including surveillance system monitor, for which there are 191,000 positions nationally and 1,250 regionally, order clerk, for which there are 1.7 million positions nationally and 465 regionally, and jewelry preparer for cast settings, for which there are 96,000 positions nationally and 205 regionally.  (R. 76-77).  All the positions Andrews identified allowed for alternating standing and sitting at will.  (R. 76).

As such, the ALJ's decision that suitable work existed in the national economy which Plaintiff could perform is supported by the record.


## CONCLUSION

Based on the foregoing, Defendant's motion for judgment on the pleadings (Doc. No. 7), is GRANTED.  The Clerk of the Court is directed to close the file.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:      June 22, 2006
            Buffalo, New York